Mr. Chief Justice, may it please the Court, my name is Eve Riley, representing the people of the state of Illinois. The appellate court's determination that the victim did not share a common dwelling with the defendant is contrary to the weight of the evidence. The defendant was originally convicted of first-degree murder for the beating death of two-year-old Ethan Hamilton. At the motion for a new trial, he asked the Court to consider involuntary manslaughter, and the Court was persuaded by defense argument. The defendant then stood silently by as he was sentenced to a enhanced sentence of 12 years for the involuntary manslaughter of a family or household member. On appeal, he challenged the trial court's finding that he and Ethan were household members. Family or household members include persons who share or formerly share a common dwelling. The only reasonable inference flowing from this evidence is that the defendant and Ethan shared a common dwelling. The defendant was involved in an ongoing, lengthy domestic relationship with Ethan and his mother, which spanned over a period of 21 months. Although neither Hampton nor defendant had their own household, they stayed together with Ethan both at the Hampton family household and at the defendant's cousin's residence on prior occasions. Defendants shared a common dwelling with the two-year-old victim for five continuous days and nights immediately prior to Ethan's death. The three were staying at defendant's cousin's house, and there was no indication that they were leaving or that they would have left had Ethan not been killed. In fact, Hampton got up, got ready for work, left her baby sleeping, and was to return after work. Hampton kept clothes, food, toys, diapers, and Ethan's medicine contained in the defendant's cousin's house. She had her own personal items, such as her clothes, including her work clothes contained at the house. Hampton and Ethan slept there, not only sharing a room with the defendant, but sharing a bed. The evidence established that Hampton, Ethan, and defendant were going about their daily lives at defendant's cousin's house, caring for Ethan, getting ready for work, eating, drinking, sleeping, even ironing their clothes. Ms. Riley, can we truly interpret the term common dwelling to encompass a common household, even if the residence or the accommodations change? Absolutely. The important factor is to look at whether they were sharing a common dwelling. Were they sharing that dwelling? There's no requirement that it be their only dwelling. There's no requirement that it be their legal residence. And very often there can be more than one dwelling in domestic situations. The evidence here, when considered in a light most favorable to the prosecution, easily supports an inference that the defendant and Ethan shared a common dwelling. Defendant obviously thought this a reasonable determination, as he made no objection before the trial court. Is the language of the statute regarding sharing a common dwelling, is that ambiguous? No. It's clear. Sharing a common dwelling means sharing a dwelling. The dictionary definition of share is to partake of, use, enjoy with others. Were they partaking, using, enjoying this dwelling with others? Absolutely. There is no question about it. Is young wrongly decided? Is young wrongly decided as far as the two homeless people sharing the dwelling, the transitory dwelling? I'm accepting your definition. The test in young is incorrect. The placing the time constraints around how long people share a dwelling, the extended, indefinite, or regular basis is incorrect. Although in this case, even if you find the test in young to be correct, this was an extended stay. There was no definite time that they were leaving. And there is evidence of regular stays going on here. This is essentially an ongoing stay cut short by the manslaughter of Ethan Hamilton. Is the statute really attempting to define relationship rather than physical dwelling? Well, I think the statute is clear that we're talking about domestic relationships. And, in fact, that definition, although contained in the criminal code, Section 112 is entitled domestic violence order of protections. We are talking about domestic relations, and we are talking about protecting victims of domestic violence. The appellate court based its decision on the Second District's decision in young. Young is vastly different from the present case. In that case, you had a situation where a defendant was charged with domestic violence after a fight broke out in front of a homeless shelter. The victim testified they had a social relationship, and they had stayed one night at a homeless shelter together. And the court found that sharing the homeless shelter for one night did not make them family or household members. And the court explicitly said that the domestic violence provisions are to provide protections for abuse in intimate relationships, and that sharing mass accommodations like homeless shelter is not the mark of an intimate relationship. That is not what we have here. This is not a mass accommodation. This is a family residence. This is not a social relationship. This is an ongoing domestic relationship. This is also not one night in a homeless shelter. This is five continuous days and nights. There is evidence that they stayed at the Hampton family home, and defendants slept there with Hampton and Ethan on prior occasions. They stayed at the defendant's house on prior occasions. This is completely different than Young. Ms. Rowley, are there any facts showing that Ethan regularly stayed there? There are facts that the three stayed together as a unit. They stayed together, the three of them, at the Hampton family home. Lovia said that the defendant slept over there with her and Ethan. And we know that she brought Ethan to the defendant's cousin's house on other occasions, as well as the fact that they were there for these five continuous days and nights immediately prior to Ethan's death. Well, we're going to hear this from Mr. Johnson, so you might as well address it now. He had no room or bed of his own there, though, right? Ethan? Ethan, no, he slept with the defendant. Even more showing of how they were sharing this dwelling, and how close this relationship was, family or household members. Was that in the living room with the defendant when he did stay there? Correct. But that was with the defendant? Yes, the defendant had a makeshift bedroom in his cousin's living room. Did he keep any of Ethan's things there? Yes, Ethan's toys were there, diapers were there, medicine, clothes, food. Everything you would need to live out your daily lives and to care for Ethan was contained as well. Non-focusing on Ethan's household members, right? Yes. And that is the focus here, right? That is the focus. That's what has to be proven. That is what has to be proven, absolutely. Although it's important to remember Ethan is only two years old, so he goes where his mother goes. Her household is his household. So the Young Court, in this case, is vastly different than Young because of the nature of the regular stays, the extended stay, combined with the fact that the personal belongings are in the home and they're living out their daily lives there. Unlike Young, when this evidence is viewed in a light most favorable to the prosecution, it does support a finding of extended, indefinite, and regular stays. The First District decisions of Glattner and In re AH are also instructive. In Glattner, the court found that seven to ten days when the petitioner slept at the respondent's residence and contributed to household chores, including buying food, was sufficient to show that they shared a common dwelling. And in In re AH, there's no real determination of how long the children were actually in the home with the perpetrator. The children were adjudicated wards of the court because they were sexually abused while in the home of their mother's friend. The family was transient. They stayed in the family van and occasionally stayed with family friends. During one of the family friend stays, the children were sexually abused by a perpetrator who lived in the basement. The court found that the perpetrator who resided in the brown home while the children were there and lived in the basement was a family or household member. In the present case, like Glattner and In re AH, the evidence was sufficient to find the defendant and Ethan shared a common dwelling. The appellate court's determination that a more permanent stay is required conflicts with the plain meaning of the statute, which contains no such requirements. There's no time limits contained in the statute. There is no requirement that the defendant and Ethan live together permanently or for any specific amount of time. And there's no requirement that the dwelling they share be their only dwelling. And we know from Glattner and In re AH that it's very often not. This interpretation excludes victims. It provides a loophole for offenders who share a dwelling but don't have their own dwelling, but share a dwelling with their paramour and his or her children at different dwellings. It also excludes child victims of domestic violence who have stayed with an offender for only a short period of time. Therefore, this court should reverse the appellate court's determination and affirm defendant's conviction and sentence. You've made an alternate argument, I think, that because the mother was having a dating relationship with the defendant. Is there any support for that in case law, statute, or otherwise? That's a public policy argument. And as I was saying before, that Ethan, being only two years old, is completely defenseless. He is in the sole care and custody of his mother. She is unquestionably in a dating relationship with the defendant. They are family or household members. You cannot exclude a minor child from the family or household of the mother or father in which he lives. The child goes where the parent goes. If she is in a household with the defendant, he is in the household with the defendant. For these reasons and all the reasons stated in our brief, we respectfully request that you reverse the appellate court's determination and affirm the defendant's conviction and sentence. Thank you, Ms. Riley. Mr. Johnson. May it please the Court, Counsel. Good morning. My name is Doug Johnson. I represent the appellee, James Elmore. I want to point out, this is an involuntary manslaughter case, not first-degree murder. Counsel started her statements with, for the beating death of this baby. The judge at the bench trial found there was no malice, found this was reckless behavior. And I submit to you, James Elmore has always proclaimed his innocence, but he is being punished for his reckless behavior right now. What the state is doing is seeking to enhance the penalty, and this is their job. They're seeking to enhance it because, as can be shown by the brief even more so than the comments today, they believe James Elmore is guilty of first-degree murder. This is involuntary manslaughter, and yes, the judge found involuntary manslaughter of a household member. The appellate court reduced the conviction back to involuntary manslaughter. This Court today, in accepting the state's argument, is going, it would be dangerous and lead to unintended results, I believe, if we are going to determine that sharing a common dwelling could possibly mean the relationship between Ethan and the defendant in this case. In any case, then, when involuntary manslaughter happens in a dwelling, it's going to be explored, this relationship, and I think, if you accept this argument, an overnight guest, almost, is going to be someone who could be a victim that would enhance the penalty to involuntary manslaughter of a household member. It's important to note that this is a post-trial theory. You look through the record, you'll see that none of this is really explored, because they weren't thinking about a household member. The prosecutors were going for first-degree murder, the defense was going for not guilty of anything, but if guilty of anything, involuntary manslaughter. What is required, counsel, under the statute for sharing a common dwelling? First, I would say, much more than it is here. But if you look at the reading of the statute. I would take the young, not surprisingly, I believe the young opinion is well-reasoned. Extended. And how do we define extended, an indefinite, or regular stay? I think if we are defining in that statute spouses, children, people related by blood, it would not make sense to, after those words, say, and people who shared a common dwelling for a short time. Now, wasn't this child was related by blood to? To Ms. Hampton. Not to Mr. Elmore. Certainly, if this child was related by blood to Mr. Hampton, we would not be here. But to take that wording and then try to say, for five days, and I'll get to the five days shortly, and say that a short time would do it, it would not make sense in the context of the statute. That statute is describing close relationships. I believe part of it is describing a relationship. I think it is anticipating people that live together, like we all think of people who have chosen to live together without getting married. And that would include some sort of indefinite, permanent, or at least extended period of time. At the trial, I think the prosecutor's statements are not evidence. I understand that. But they show an absence of evidence of this household member issue. The prosecutor at 517 said, quote, they don't live together. At 499 of her closing argument, the prosecutor said, this was a sometimes boyfriend. The dating relationship in the brief in today was not as strong as it has been painted by the state. And I want to get to, well, first the state is asking, they set forth the definition of to dwell from, I believe, Webster's online dictionary. To dwell means to stay for a time. And then I would note, if you look at that source, after I got the reply brief, I looked online and saw that the next definition is to live as a resident. So, yes, the first one they set forth is to stay for a time. But the next one is to live as a resident. I think that shows what to dwell means, the plain and ordinary meaning. Mr. Johnson, you indicated you're relying on Young. But even Young seems to acknowledge that the list that's included under 112A-3 is not exclusive. It says includes. Are we free to interpret that statute to mean that something else could mean a family or household member? Or does that mean it depends upon the facts of the case and the finder of fact can make a finding that someone is a household member that would not fit within these exact parameters? I believe, I understand that Young said this list is not inclusive. I believe the list as written is, it says includes. So I would have to admit that there possibly could be some other type of relationship that fit the spirit of the statute. But we have nothing like that here. And I'm not saying that's the only relationship they easily could have. But the only thing the State is arguing is to share a common dwelling. And they're saying that because Ethan and the defendant used and enjoyed this dwelling for a time, they shared a common dwelling, and that does not fit at all. Did the prior fact take into consideration the fact that Ethan slept with a defendant, or is this a list that the jury could make a finding of a household member? I don't think that would suffice. And I also want to point out that the defendant didn't sleep with the baby. The air mattress was in, it wasn't a makeshift bedroom, it was an air mattress in a living room, and the defendant slept on the floor. I think human nature is that was not going to be any type of permanent relationship. So if that was an issue, they weren't sleeping together on the air mattress. There wasn't enough room. The defendant was on the floor. And as far as James Elmore babysitting for this baby, he didn't babysit. That's in, the record site escapes me now, he did not babysit. There is a portion in the record where the prosecutor states the only reason that James Elmore babysat on this occasion was because there was no family member available. Again, I understand the prosecution's words are not evidence, but that is also what was said. Mr. Johnson, does the fact that the statute says persons who share or formerly shared a common dwelling, I want to focus on the formerly shared common dwelling, does that indicate at all to you that perhaps permanency, isn't the permanency requirement of Young, which is I think contrary to the Glaser case or the case cited by the state, Glader case, the permanency required that you're relying on per Young, does the fact that the statute says or formerly shared a common dwelling, does that say at all that maybe permanency is not a requirement? I mean, is there a permanent relationship that was formerly shared and now there's a permanent relationship that's shared now? If I remember Young correct, I believe first of all that Young, Glader, or Glader, and In Re Age can all be harmonized. But to answer your question, I don't believe it has to be a permanent relationship. I think Young said some degree of permanency, and I do believe it has to be that. Perhaps it could have lasted something more than a few days together. There is nothing in this record that suggests these people really had ever done this on any type of basis. If you look at Ruby Watkins' testimony, who lived right below, she said, where's James Elmore? Well, sometimes he stays upstairs in Charles and Terrell's apartment. Or does his girlfriend stay over? And Ruby Watkins said, once or twice. And was Ethan with them? And it's important, of course, to remember we're talking about Ethan. There's no record that Ethan was with them the five days. The entire basis of a very strong basis of the state's argument is they were there for five days. And I do admit there is some evidence that they were there for five days, but it's not as strong as the state points out. For instance, the only evidence is on page 190 of the record. And that is where the detective is speaking to James Elmore about talking to him after the incident. I think the baby has been taken away. And then Detective Sandoval says, yes, I asked him if the baby and the mother had lived there. And he informed me that no, they had not lived there, but they were visiting since Friday. That's where they get the five days. Ms. Hampton doesn't say five days. It's all what the defendant says. And in the very same sentence, one sentence that they are basing a lot of their argument on, James Elmore said they do not live here. They have been visiting. If they are visiting, they can't have shared a common dwelling. They are visitors. Is that how you would interpret the whole statute? I see also in the statute persons who have or have had. I know this isn't the issue here that we're talking about. But persons who have or have had a dating or engagement relationship. So engaged for a day isn't enough, dating for a week isn't enough. Some type of relationship is further than five days. I believe the case law shows some sort of intimate relationship that went beyond mere courting. But it has to be, yes, a more serious relationship as far as the dating goes. Now, the state argues they kept things, went on and on. They kept things at this apartment. Belongings, toys, things like that. That also is not what the record says. There was one question it was posed to Ms. Hampton on page 61 of her testimony. You had, when you were staying there, you had, did you have any belongings or clothes or toys for the baby? Or anything like that that were there with you? Yes. First of all, it's or, it's not and. Secondly, we can't tell, that's the beginning and end of it, we can't tell if we're talking about one toy for the baby or anything like that. If we're talking about the idea of ironing clothes and living there, counsel argues that to show some sort of permanency. On that morning, James Elmore ironed Ms. Hampton's shirt as she prepared for work. There is no indication that the shirt was hung up somewhere or in a closet because this was some sort of common dwelling they shared. Rather, if you look at page 68 of the record, it shows that Ethan and Ms. Hampton had overnight bags. So Ms. Hampton is identifying pictures and she says, that's my bag, that's Ethan's bag. It's very clear, just as the appellate court found, any items that were there, were there because they brought them. So there may be a case where sharing a common dwelling doesn't mean living together in the sense we may normally think the way I think of living together. But this is not the case. But sharing a common dwelling was not an issue at the trial, is that right? It was not an issue at the trial. It happened. And I think the state said the defendant didn't say anything when the judge sent it, is that right? That is correct, yeah, it happened. It was a little unique, I guess, in my experience, that it wasn't talked about. The defendant was found guilty of first-degree murder, came back after the judge took a long time to consider it, said no, it's involuntary manslaughter, went right into sentencing, and then we have involuntary manslaughter of a household member. Another point of how this could not be the sharing of a common dwelling is that Ms. Hampton admitted that she had a common dwelling. She admitted, I couldn't go there any time I wanted to. What do you need to share a common dwelling? I submit to you, you have to have the permission to go there when you want to. At some point, I, if I'm going to share a dwelling, I share it with someone else, and we both have the right to be there at the same time. Ms. Hampton said it in 48, I'm sorry, in 95-96 of the transcript of her testimony. She couldn't, they asked her, could you go there whenever you wanted? And she said, no, not whenever I wanted. That's not her dwelling. It's probably not his dwelling. He stayed there on occasion on his air mattress. But that can't be the sharing of a common dwelling. As far as back to Glader and A.H., I believe, I know the young court cited Glader as if there was unsupported reasoning for the opinion, but I think in Glader, what they had was two people that lived together for three months. The respondent and the petitioner lived together for three months. We don't have that here. I think they lived together in 89, the incident was 90. The petitioner spent 90, he said, I spent 90% of my time there. He contributed to the household expenses, and he kept a full complement of clothes there. We have nothing like that here. So I think Glader doesn't have to be overruled to say that those two people in Glader shared a common dwelling, but not here. And as far as in Ray A.H., if you go through that opinion five to ten times, you still can't find how long Shorty was the name. There's a perpetrator named Shorty, and then two victims of sexual abuse. And the issue, not exactly the same, the case was under the Juvenile Court Act. But if you look at that case, you can't tell how long Shorty and those two victims lived together. So the state in their brief says, well, this, along with Glader, support the notion or set the precedent that a short-term temporary stay is sufficient to justify the sharing of a common dwelling. In Ray A.H. does not say that. Shorty could have lived there for quite some time with the two children. It is true the family, the household, lived a nomadic existence, but there is nothing in that case that tells you how much time. And it doesn't stand for the proposition that a short-term temporary stay is enough. The, so in closing, what is a common dwelling, I submit to you, it's a place where you live for an extended time, certainly more than five days. And as I pointed out, the evidence shows here this was a five-day visit that we don't know anything about. Ethan, we don't necessarily know that Ethan was there every day or what was done or if they went home for one day or if they started their visit on Friday and then came back. It's a place you can dwell where you want, at least at some point, if you're going to share a common dwelling. How about a place that in one time in your life you have called home or referred to as I lived there, because Ms. Hampton said I didn't live there. A place where you've contributed to household expenses. Your name's on a lease, you own it. I'm not saying this is the only test, but it would be one consideration. A place where you keep your clothing. A place where you keep food you like. And a place you've been perhaps more than once or twice. Certainly, one could infer from this record that she was there more than once or twice, but there's also evidence that she was there only once or twice. It is certainly not a frequent, a situation of frequent visitation. It wasn't an ongoing, lengthy relationship. Hampton, counsel stated that Hampton did not have her own household. She did have a household. She had many family members, and she stated where she lived, and she gave the address of where she lived. She had a household, and it was elsewhere. And we also, in a perfect world, I suppose, Ethan goes where mom goes. But unfortunately, that isn't the way life works, and we don't know. I'm not casting aspersions on Ms. Hampton, but we don't know that she always had this baby with her wherever she went. And so we don't know that she, you know, unfortunately, a two-year-old can be excluded from a household. So for all those reasons, we would ask that the appellate court be affirmed, and that the case be remanded for resentencing pursuant to the involuntary manslaughter statute. Thank you, Mr. Johnson. Ms. Riley. Defendant attempts to construe all of the evidence in a light most favorable to the defense. However, the evidence must be construed in a light most favorable to the State, and all reasonable inferences must be made in favor of the State. Defendant's own admission was they had been there for five continuous days and nights. That is what he told the detective, five continuous days and nights. There is evidence in the record coming from Ms. Hampton that the defendant slept at her family's residence, and that she had stayed at his residence on other occasions. So even if it's not his residence, it's his cousin's residence, they're staying together as a unit, and the baby is with them. And that is what makes this case so different than Young. This is a domestic situation. This is an ongoing stay. This is an extended stay. We don't know how long they would have stayed there. There was no indication that they were going to leave. They did have clothes there, they did have food there, and they did iron their clothes there, and they were sharing a common dwelling. There's no requirement that it be their only residence, their only dwelling, their legal residence. There is no requirement in the statute. And the language of the statute says share or formerly share, indicating the broad reach of this statute. It doesn't matter if you shared a common dwelling 50 years ago, you are a family or household member. So it would make no sense to exclude victims in recent relationships or sharing a dwelling for a short time when those are the victims who need the protection far greater than people who lived together 50 years ago. As far as INRAE-Glatner and INRAE-AH, the defendant claims that these don't provide guidance because they dealt with different issues. However, the important thing about Glatner and INRAE-AH is they analyze whether the offender and the victim shared or formerly shared a common dwelling under the Domestic Violence Act. The definition contained in the Domestic Violence Act is the same as the definition contained in the criminal code, share or formerly share a common dwelling. And in Glatner, although there was testimony that the, from the petitioner that they had lived together for three months, there was testimony from the respondent that it was seven to ten days. And the court says that's a conflict in the testimony, but anyway, we find that seven to ten days when you are contributing to household expenses, including buying food, is sufficient to show people share or formerly share a common dwelling. It's also important to note that at trial, the defendant did everything he could to align himself with this victim. And in fact, when sentenced to the enhanced sentence, he doesn't say, Ethan's not my family or household member, oh, that child that stayed over, that social acquaintance that stayed over around the time of the incident, no. He says, this child, I have cried, he tells the court how he cried over the loss of this child that he treated as his very own. He thought he was a family or a household member, and now wants to say this case is exactly like Young, a social acquaintance who brought his bag. That is not what happened here. This is an ongoing, lengthy domestic relationship. It's an extended stay cut short by manslaughter. For these reasons and all the reasons stated in our brief, we respectfully request that you reverse the appellate court's determination and affirm defendant's conviction and sentence. Thank you, Ms. Riley. Case number 109649, People v. James Elmore. Agenda number three will be taken under advisement. This concludes our oral argument docket today. Mr. Marshall, the Supreme Court stands adjourned until the next hearing. Thursday morning, January 13th, 2011, 9 a.m.